[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is the second appeal filed by the plaintiff, Commission on Human Rights and Opportunities ("CHRO")[1], from a final decision of a human rights referee of the CHRO, dismissing a complaint brought against the defendant, city of Torrington ("the city"). The CHRO's appeal is authorized by General Statutes §§ 46a-94a and 4-183 of the Uniform Administrative Procedure Act ("UAPA"). For the reasons set forth below, the court dismisses the appeal.
The background to this appeal is as follows. In December 1996, four female employees of the city, Nancy Gyurko, Debra Remillard, Charlene Antonelli, and Lisa Bambikidou, filed complaints with the CHRO, which were later consolidated, alleging that the city had violated the Equal Pay Act, 29 U.S.C. § 206 (d)(1), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Connecticut Fair Employment Practices Act ("CFEPA"), General Statutes § 46a-60 (a)(1). On a finding of reasonable cause, the complainants' case was presented by the CHRO's commission counsel before a human rights referee. See General Statutes § 46a-84. On January 26, 2000, the human rights referee dismissed the complaint on the ground that the CHRO did not present a prima facie case of discrimination under federal or state law. The CHRO appealed this dismissal to the Superior Court.
On April 25, 2001, this court ruled that the human rights referee correctly determined that the CHRO had failed to present a prima facie case under the Equal Pay Act. However, with regard to the CHRO's allegations of a violation of Title VII and CFEPA, the court found that the human rights referee had not analyzed the evidence of record to determine whether a prima facie case existed under the separate standards of those provisions. The case was remanded for further proceedings before the human rights referee.[2] On July 13, 2001, the referee dismissed the Title VII and CFEPA claims.[3]
As in his prior decision, the human rights referee found that Gyurko, CT Page 6165 Remillard, Antonelli and Bambikidou are or were managerial employees of the city. According to the human rights referee's findings, prior to 1992, like other management employees of the city, the four employees' salaries were set by the city council through a management resolution. After 1992, on the formation of a management-level union, their salaries were determined through collective bargaining. In the first contract, effective July 1, 1993 through June 30, 1995, Article XIV of Section 14.1 required the city to "evaluate positions" and use the results of the evaluation as the basis of further negotiations.
The city hired a consultant to perform the evaluation of both union and non-union management positions. After gathering information, including revised job descriptions, and conducting interviews, the consultant presented his job study in November 1994. The job study, (Return of Record ("ROR"), Volume 8, Item 87, pp. 1174-99), established points and position levels for each position evaluated. The job study was used in negotiations between the management employees' union and the city in an attempt to reach a contract in 1996, but eventually resolution was reached through a binding arbitration award in 1997.
In the arbitration award, there was a 2.5 percent general wage increase to all union members and wage equity adjustments to fourteen people, including the four complainants herein, each in differing amounts, retroactive to July 1, 1996. Afterwards, a successor collective bargaining agreement for the years 1998 to 2001 was concluded by the parties, granting union members a 3 percent per annum increase. According to the human rights referee, there were currently twenty-eight management positions in the city. Nineteen positions were represented by the union. Seven positions were held by females, seventeen were held by males and four were vacant. (ROR, Volume 1, Item I, pp. 3-5.)
Having set forth the general background, the human rights referee then stated the nature of the dispute between each complainant and the city. Gyurko holds the title of director of elderly services and received 53 points in the job study. The superintendent of streets also received 53 points, but is paid a higher salary than Gyurko. Remillard holds the position of nutrition supervisor for the elderly nutrition program and received 43 points in the job study. The assistant superintendent of streets and the environmental planner each received 40 points in the job study. Each position is now vacant, but when filled the projected salary for these positions exceed that of Remillard. Antonelli holds the position of purchasing agent and received 43 points in the job study. The data processing manager received 40 points in the job study; the assistant superintendent of streets, the environmental planner and the data processing manager are paid a higher salary than Antonelli. Finally, Bambikidou holds the position of assistant parks and recreation CT Page 6166 director and received 34 points in the job study. The zoning enforcement officer received 30 points in the job study and is paid a higher salary than Bambikidou. (ROR, Volume 1, Item I, pp. 5-6.)
In analyzing whether these facts amounted to pay discrimination under Title VII and CFEPA, the human rights referee decided that the job descriptions compiled as part of the job study are "extremely relevant" to the question of whether the jobs are "similar or comparable." Having looked at these job descriptions, the testimony of the complainants, the other documentary evidence, the human rights referee came "to the conclusion, in each of these cases, that the jobs of the complainants were not `similar or comparable' to the jobs held by the higher paid males." (ROR, Volume 1, Item I, p. 29.) The job duties, educational requirements and prior work experiences were substantially different from job to job. (ROR, Volume 1, Item I, p. 30). Therefore, the human rights referee dismissed the complaints because the CHRO had not established a prima facie case, and even if it had, the CHRO did not meet its burden of proving that the city's nondiscriminatory reason was pretexual. (ROR, Volume 1, Item I, pp. 33-35.)
The CHRO has appealed from the ruling of the human rights referee. The human rights referee's factual and legal conclusions are reviewed by this court under the substantial evidence test. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . The substantial evidence standard is satisfied if the record provides a substantial basis of fact from which the fact in issue can be reasonably inferred. . . ." (Citations omitted; internal quotation marks omitted.) Adriani v. Commission onHuman Rights and Opportunities, 220 Conn. 307, 314-15 (1991); see alsoMiko v. Commission on Human Rights and Opportunities, 220 Conn. 192, 201
(1991) (question is not whether the trial court would reach the same result, but whether the record before the agency supports action taken);Dufraine v. Commission on Human Rights and Opportunities, 236 Conn. 250,259 (1996) (substantial evidence test imposes an important limitation on the power of the courts to overturn a decision of an administrative agency); MacDermid, Inc. v. Dept. of Environmental Protection,257 Conn. 128, 137 (2001) (substantial evidence rule is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard).
As indicated in this court's prior opinion, this is not a case where overt evidence of pay discrimination has been presented, but one where the CHRO proceeds under the theory of disparate treatment. McDonnellDouglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
CT Page 6167 (1973); Ann Howard's Apricots Restaurant, Inc. v. CHRO, 237 Conn. 209
(1996) (stating equivalent Connecticut rule). Under the disparate treatment approach, the CHRO must present a prima facie case, and then the city had the opportunity to articulate a legitimate, non-discriminatory reason. The CHRO then must prove the reasons set forth by the city were pretexual. McDonnell Douglas Corp. v. Green, supra, 802, 804.
The prima facie case in the instance of pay discrimination under Title VII has been stated as follows. "[A] female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males. . . ." (Citation omitted.) Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1363 (10th
Cir. 1997). "Under the McDonnell Douglas approach for gender-based wage discrimination, a Plaintiff must establish a prima facie case by showing by a preponderance of the evidence that she has a job similar to that of higher paid males." Rodriguez v. SmithKline Beecham Pharmaceutical,62 F. Sup.2d 374, 382 (D.Puerto Rico 1999), aff'd, 224 F.3d 1 (1st
Cir. 2000).
In the present case, the human rights referee found that the complainants "were paid less than the male management employees to whom they compared themselves . . . (ROR, Volume 1, Item I, p. 31.) Therefore, to meet its prima facie case, the CHRO had to establish that "the work performed by the female employee need only be similar or comparable" to the suggested male comparables. Lenihan v. Boeing Co.,994 F. Sup. 776, 799 (S.D.Tex. 1998).
Similarity depends on "what people actually do on the job, not job titles or department designations. Skill, effort, responsibility, and the general complexity of the work are the guideposts in determining job similarity." EEOC Compliance Manual, Questions and Answers on Compensation Discrimination (2000). Looking to Examples 1 and 2 in the EEOC compliance manual, Section 10, it is clear that engineers on a development team may be found "similarly situated" to engineers on a testing team, based on a review of their skill, effort, and responsibility. The difficulty occurs in deciding whether positions with different job titles or functions have sufficient similarity. Thus, inCrockwell v. Blackmon-Mooring Steamatic, Inc., 627 F. Sup. 800 (1985), the positions of "household cleaner" and "carpet cleaner" were held similar under Title VII. "Although the work performed by household cleaners and cleaning technicians was not `substantially equal' within the meaning of the Equal Pay Act, cleaning technicians were situated similarly to [the female] plaintiff [for Title VII purposes]. The jobs had many similarities and included similar requirements of effort and responsibility. Some of the duties were the same." Id., 806. CT Page 6168
On the other hand, the plaintiff, in Coward v. ADT Security Systems,Inc., 140 F.3d 271 (D.C. Cir. 1998), failed to prove that her position of data supervisor was similar to that of a higher-paid project manager. "The `Project Manager' title in ADT's records is her only evidence suggesting that her duties and skills amount to anything other than those of a Data Supervisor. She has pointed to no other evidence that would support an inference that she is a Project Manager or should be paid like one. Although job titles usually serve as strong evidence of an employee's actual skills and duties . . . [the plaintiffs] admission that she knew nothing about the duties of Project Managers or even that she held the title, together with ADT's undisputed explanation that the title was temporary, eliminates any genuine dispute about the real nature of her work." (Citation omitted.) Id., 275.
The CHRO relies primarily on the points assigned to the complainants and their alleged male comparables by the job study for proof of similarity. See, e.g., Brief of the Plaintiff Commission on Human Rights and Opportunities, p. 11: "After all, the job study rated each woman substantially equal or higher to the comparative men in the responsibility categories." This was also the testimony of the complainants. As Remillard testified at the hearing:
 Q. . . . Do you believe that the same number of points should result in the same salary?
A. Yes.
Q. And why is that?
 A. Because the points were derived from the knowledge, the responsibility, the budgetary equal factors, so when you compare equal factors of what you need to know and what you're responsible for, I feel that the pay should be the same.
(ROR, Volume 7, Item 72, p. 1045.)
The court disagrees that the job study provides the CHRO with the necessary proof of similarity. This is basically the theory of comparable worth which has been "banished from our jurisprudence." Loyd v. PhillipsBrothers, Inc., 25 F.3d 518, 525 (7th Cir. 1994); see, e.g., Lemons v.Denver, 620 F.2d 228 (10th Cir. 1980), cert. denied, 449 U.S. 888
(1980) (rejecting a cause of action for nurses who claimed to be underpaid in comparison to different jobs of equal worth.) In AmericanNurses' Association v. Illinois, 783 F.2d 716, 721 (7th Cir. 1986), Judge Posner, after reviewing the economic underpinnings of the CT Page 6169 comparable worth doctrine, concluded with American Federation of State,County Municipal Employees (AFSCME) v. Washington, 770 F.2d 1401, 1407
(9th Cir. 1985) that "comparable worth statistics alone are insufficient to establish the requisite inference of discriminatory motive." (Internal quotation marks omitted.)
In Connecticut State Employees Ass'n v. State, United States District Court, District of Connecticut, Docket No. H-79-197 (February 25, 1983,Clarie, J.), the court refused to "engage in a subjective comparison of the intrinsic worth of various dissimilar jobs," citing Power v. BarryCounty, 539 F. Sup. 721 (W.D.Mich. 1982). The court also pointed out that County of Washington v. Gunther, 452 U.S. 161 (1981) in both majority and dissenting opinions "expressly stated that the [Title VII] claim was not based on a theory of comparable worth."
Judge Clarie did conclude that if "the defendants did in fact determine that dissimilar jobs were of equal value, but did not provide equal pay because of the sex of the employees," a cause of action would exist. The CHRO contends that the record shows that the city has conceded the job study determined the jobs at issue to be equivalent to each other. This contention is not supported by the record. Michaud, the union representative, testified that the parties agreed that the "significance of the point value" was to "set salaries" in a second contract. (ROR, Volume 6, Item 71, p. 699.) Gritt, the city's personnel director, was asked if the "position evaluation" focused on "gender inequalities." Gritt answered: "It didn't focus on gender. It was a concern regarding all classifications in the bargaining unit." (ROR, Volume 5, Item 70, p. 526.) It did not have as its function, the establishment of a particular wage or salary. (ROR, Volume 5, Item 70, p. 533.) The CHRO has not demonstrated that the city admitted that different positions reviewed in the job study became "similar" for the purposes of Title VII merely because they were grouped within certain point ranges.
The other evidence of CHRO to show similarity[4] was first the individual complaints filed with CHRO. (ROR, Volume 4, Items 69, 69a, 69b, and 69c.) The second was the testimony of each complainant. (ROR, Volume 6 and 7, Items 71 and 72.) The final type of evidence was the job descriptions referred to by the human rights referee in his decision. (ROR, Volume 8, Items 78-86.) The individual complaints are merely a general recitation that the complainants' rights have been violated. The complainants did describe their own daily tasks, but mostly their testimony consisted of pointing to the fact that the comparable male managers had received equal points to them in the job study, but were receiving more compensation. (ROR, Volume 7, Item 72, p. 907 (Gyurko); Volume 7, Item 72, p. 1045 (Remillard); Volume 7, Item 72, p. 1076 (Bambakidou); Volume 6, Item 71, p. 800 (Antonelli).) This testimony is CT Page 6170 not helpful on the issue of similarity.
The human rights referee, as indicated, attempted to find similarity by scrutinizing the job descriptions to find "the real nature of the work" being performed. He decided to make use of the job descriptions, in the absence of other witness testimony, such as the male employees, about the similarities and differences between the work the complainants did and the work the men did. (ROR, Volume 1, Item I, p. 9.) Comparing the job descriptions, the human rights referee found that "[t]he job duties of the Complainants . . . were substantially different from the male employees to whom they compared themselves."[5] (ROR, Volume 1, Item I, p. 30.) Further, "[t]he Educational requirements, as described in the testimony and the job descriptions, were significantly different for each of the positions in question — both for the men as well as for the women."[6] (ROR, Volume 1, Item I, p. 30.) Finally, "the prior work experiences, as well as the supervisory work experience, of each position, were substantially different from job to job."[7] (ROR, Volume 1, Item I, p. 30.) He concludes: "It is clear to me that the women could not immediately move into the positions of the males to whom they compared themselves without going back to school for some additional education, as well as, more on-the-job training in the other fields, as well as obtaining more additional supervisory experience in those other jobs occupied by the men." (ROR, Volume 1, Item I, p. 30.)
The finding by the human rights referee that there is no job similarity is drawn from the job descriptions in the record, and is thus based on substantial evidence. The conclusion that positions are not similar is "for the trier of fact to decide." Lavin-McEleney v. Marist College,239 F.3d 476, 480 (2d Cir. 2001). The human rights referee's factual conclusion follows the EEOC compliance manual, which states: "Persons in jobs requiring certain minimum objective qualifications should not be grouped together with persons with jobs that do not require those qualifications, even though the jobs are otherwise similar."
This analysis means that the human rights referee has properly concluded that the CHRO did not meet its prima facie case requirement. The CHRO gives two other theories on which a prima facie case may be found, both drawn from the EEOC compliance manual. The first is that the employer sets the pay for jobs predominantly held by women below that suggested in a job evaluation study, while the pay for jobs predominantly held by men is consistent with the level called for by the job evaluation study. This theory must fail here, however, as there are instances in the record where males are currently being paid less than a comparable female. The city assessor, a male, is being paid, for example, at a rate lower than the prior assessor, who is a female. The assessor has the same point total in the job study as the director of elderly services but is CT Page 6171 receiving a lower salary. (ROR, Volume 5, Item 70, p. 603.)
The second theory from the EEOC compliance manual is that a discriminatory compensation system that disadvantages women has been discontinued, but salary disparities caused by the system still continue. There is no evidence in the record to support this theory here. There is proof of the salary differences between the four complainants and the male comparatives, but there is nothing in the record to show that the differences are "caused by the system." Cf.American Nurses' Association v. Illinois, supra, 783 F.2d 720, allowing a complaint to stand under Title VII alleging that an employer hadintentionally depressed women's salaries because they were women and had ignored the recommendations of a remedial job study.
Since the court concludes that the human rights referee properly decided that the CHRO did not present a prima facie case, it is unnecessary for the court to consider the other portions of the disparate treatment formula. Campana v. Greenfield, 164 F. Sup.2d 1078, 1088
(E.D.Wis. 2001) (court may grant summary judgment in pay discrimination suit at prima facie stage); Morris v. Tri-Town Teachers F.C.U., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 354839 (July 13, 2000, Melville, J.); Diaz v. Housing Authority of Stamford,258 Conn. 724, 732 (2001).
The appeal is therefore dismissed.
_______________________ Henry S. Cohn, Judge