**Marla GIBSON, Plaintiff,**

v.

**AMERICAN LIBRARY ASSOCIATION, Defendant.**

**No. 92 C 5284.**

United States District Court, N.D. Illinois, E.D.

Aug. 25, 1993.

Opinion Granting Reconsideration in Part Sept. 22, 1993.

H. Candace Gorman, Chicago, IL, for plaintiff.

Bradford P. Lyerla, Kenneth R. Dolin, David K. Haase and Jenner & Block, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Plaintiff Marla Gibson sues defendant American Library Association ("ALA") for race and sex-based employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, Pub.L. 102–166 (Nov. 21, 1991). Gibson also sues under the Equal Pay Act, 29 U.S.C. § 206(d). In addition to these federal claims, Gibson sues ALA for intentional infliction of emotional distress, invoking the court's supplemental jurisdiction under 28 U.S.C. § 1367. ALA moves for summary judgment on all of Gibson's claims.

### BACKGROUND

ALA is a not-for-profit association that promotes libraries and librarianship throughout the United States. ALA's principal office is in Chicago, Illinois. ALA's Local Rule 12(m) Statement of Facts ("ALA Facts"), ¶ 1. Gibson, a black woman, was employed by ALA as director of human resources from December 1987 to August 1, 1992. ALA Facts, ¶ 2. In June 1992, Gibson filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights, alleging that ALA had discriminated against her from the time she was hired to the time of her constructive discharge. Complaint ¶ 5. On July 22, 1992, the EEOC issued a right-to-sue letter to Gibson. *Id.* at ¶ 6. Thereafter, Gibson timely filed her complaint.

Count I of the complaint alleges that ALA violated Title VII by discriminating against

her on the basis of sex with regard to its pay policies and the terms and conditions of her employment. Count II is substantially identical to count I; however, count II alleges discrimination on the basis of race. Count III alleges that the discriminatory conduct complained of in counts I and II constitutes intentional infliction of emotional distress. Gibson alleges that ALA's conduct has caused her to suffer from ulcers and has resulted in the aggravation of preexisting medical conditions. Count IV alleges that ALA violated 42 U.S.C. § 1981 by denying her equal terms and conditions of employment on the basis of her race in that ALA: failed to provide her pay equal to that of non-blacks who performed similar duties; treated her in an unprofessional manner because of her race; ignored and condoned threats of violence and insults directed at her; subjected her to different procedures than non-black directors; and humiliated and degraded her on the basis of her race. Count V alleges that ALA willfully violated the equal pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d), by paying higher wages to male directors.

In support of her claim of discrimination under Title VII and section 1981, Gibson presents evidence of a wide range of incidents that purport to evidence disparate treatment:

(1) After Gibson accepted ALA's employment offer in 1987, but before she began work in December 1987, ALA informed her that she should attend ALA's mid-Winter conference in San Antonio, Texas in January 1988. Although Gibson did not object to attending, she felt she should have been afforded more advance notice. ALA Facts ¶ 29. There was another incident in which she was not provided adequate notice to prepare for a meeting to review her budget. Gibson's Local Rule 12(n) Statement of Facts ("Gibson Facts"), Exh. G, Gibson Dep. at 391;

(2) Gibson's supervisor, Ernest Martin, did not meet with her until her second week of work, and consequently she was introduced to the other employees by Louise Brewer, her subordinate. ALA Facts ¶ 30, Gibson Facts ¶ 26;

(3) Ideas suggested by Gibson regarding preventative affirmative action were rejected, while similar ideas were accepted from a white female attorney who was retained by ALA as an affirmative action consultant. ALA Facts ¶ 33, Gibson Facts ¶¶ 29, 30;

(4) Gibson asserts that she was discriminatorily denied secretarial support in 1989 ostensibly because of a hiring freeze while white employees were able to hire secretarial support. ALA Facts ¶ 35, Gibson Facts ¶¶ 32–34;

(5) Gibson asserts that following a burglary in 1988, ALA was slow in replacing equipment stolen from the human resources department. ALA Facts ¶ 49;

(6) ALA did not follow Gibson's advice that it discontinue its long-standing practice of allowing employees to write book reviews for a flat fee. Gibson was concerned that the practice violated the Fair Labor Standards Act. ALA Facts ¶ 50;

(7) In September 1989, deputy executive director Roger Parent sent a memorandum to Gibson's supervisor, Ernest Martin, and to Gibson stating that the affirmative action presentation made by Sharon Reese, an outside consultant, was excellent because she made a subject that could be threatening and dry very lively and entertaining and real. ALA Facts ¶ 52. Gibson, in turn, sent a memorandum to Parent and Linda Crismond, then the executive director, stating that she found it shocking that anyone would find affirmative action threatening. ALA Facts, Exh. B, Gibson Aff. at 386. Crismond called a meeting with Parent, Martin, and Gibson at which Parent yelled and screamed at Gibson, pounded his fist on the table, and shook his finger in Gibson's face. Gibson Facts, Exh. G, Gibson Aff. at 388;

(8) A co-employee, Charles Harmon, physically threatened Gibson, stating that she "had better watch her back" until a problem involving benefit deductions was rectified. *Id.* at 376;

(9) Martin required Gibson to clear her recommendations through her subordinate Louise Brewer, a black woman. ALA Facts, Exh. B, Gibson Dep. at 455–459;

(10) ALA discriminatorily refused to let Gibson's sister assist with work in the human resource office whereas ALA permitted other employees to bring in relatives to work for them. *Id.* at 470–71, 480;

(11) Anonymous racially insulting messages were left on Gibson's voice mail and ALA discriminatorily failed to take any action. *Id.* at 485–487. In the past when sexually explicit messages were left on another employee's voice mail, ALA circulated a memorandum indicating that such conduct would not be tolerated. *Id.* at 487;

(12) ALA program officers, all of whom were white, insisted on being consulted regarding changes in personnel policies. *Id.* at 537, 539. Gibson felt she had no support from the empowered group at ALA, she felt she was standing alone, and that it was a demeaning and dehumanizing experience. *Id.*;

(13) At an affirmative action meeting on April 7, 1992, Linda Crismond greeted everyone in attendance except her, and while Crismond asked the other attendees for input throughout the meeting, Gibson was not asked for input until the end of the meeting. *Id.* at 497–98. At this meeting, Bill Snapp, an outside attorney for ALA, commented that ALA needed to be careful about affirmative action objectives because they may lead to the hiring of unqualified people. Gibson found the remark insulting and found it inappropriate that neither Crismond nor Martin objected to the statement. *Id.* at 503;

(14) The offices of the human resources department were moved without any input by Gibson and without any advance notice to her. *Id.* at 524.

Gibson claims that she and other ALA minority employees experienced ALA as a racist environment in which minorities were treated as non-entities, received more difficult assignments, were not exposed to training, and were brought in at clerical positions without good career growth opportunities. *See id.* at 542–43, 611.

## DISCUSSION
### Summary Judgment Standard

 Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513.

### Equal Pay Act and Wage–Discrimination Claims Under Title VII and § 1981

#### 1. Equal Pay Act

 To establish a *prima facie* case under the Equal Pay Act, Gibson must show that: (1) ALA paid different wages to males; (2) the male employees performed equal work that requires equal skill, effort, and responsibility; and (3) the work was performed under similar working conditions. *See Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 548 (7th Cir.1991); *Fallon v. State of Illinois,* 882 F.2d 1206, 1208 (7th Cir.1989). Gibson must establish, based

upon " 'actual job performance and content—not job titles, classifications or descriptions' that the work performed ... is substantially equal." *E.E.O.C. v. Mercy Hosp. & Medical Center*, 709 F.2d 1195 (7th Cir.1983) (quoting *Gunther v. County of Washington*, 623 F.2d 1303, 1309 (9th Cir.1979), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)). However, the work need not be identical. *Fallon*, 882 F.2d at 1208. It is sufficient if the duties involve a "common core" of tasks, that is, "whether a significant portion of the two jobs is identical." *Id.* at 1209.

■ ALA contends that Gibson fails to establish a *prima facie* case under the Equal Pay Act because none of the male employees with whom she compares herself perform "equal work" within the meaning of the act. Gibson compares her salary to that of the director of marketing (Evelyn Shaevel), director of research and statistics (Mary Jo Lynch), accreditation officer (Prudence Dalrympole), director of library information technology association (Linda Knudsen), public information officer (Linda Wallace), director of membership services (Gerald Hodges), director of data processing (Richard Roman), and controller (Russ Swedowski). *See* ALA Facts, Exh. B. Gibson Dep. at 286–305. For purposes of discussing Gibson's Equal Pay Act claim, the only relevant comparisons are with the male employees.

Although Gibson compares her salary to the salaries of Hodges, Roman, and Swedowski, she fails to raise a genuine issue as to whether her job duties were substantially equal to their's. Gibson's testimony regarding the duties and qualifications of Hodges, Roman, and Swedowski reveals that she cannot meet the "equal work" element of the *prima facie* showing required under the Equal Pay Act. Gibson testified that Swedowski's position of controller required "an undergraduate degree in finance and/or accounting." *Id.* at 304. She also testified that the controller position may have required a

certified public accountant. *Id.* Gibson's position as human resource director did not have comparable requirements. *See id.*, Dep. Exh. 17, human resource director job description. Thus, the skills required of the controller are distinct from those required of the director of human resources. Further, Gibson makes no showing that the job duties of the controller are substantially equal to her job duties. Gibson's description of the job duties of Hodges and Roman in their respective capacities as director of membership services and director of data processing also reveals virtually no overlap with her duties. *See id.* at 297–98, 301, and Dep. Exh. 17. Because Gibson fails to raise a genuine issue as to the equal work element, ALA's motion for summary judgment on Gibson's Equal Pay Act claim is granted.

## 2. *Wage Discrimination Under Title VII and § 1981*

■ Gibson's Title VII and section 1981 wage discrimination claims require more complex analysis due partially to the fact that neither the Supreme Court nor the Seventh Circuit has articulated clear standards governing wage discrimination claims brought under Title VII.[1] In *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court held that a Title VII claim of discriminatory undercompensation is not barred merely because the plaintiff does not perform work equal to her opposite-sex counterparts. *Id.* at 181, 101 S.Ct. at 2253. However, the Court did not delineate the contours of wage discrimination claims brought under Title VII. *Id.* Rather, the Court emphasized the narrowness of the question presented, which was whether a claim based on direct evidence of intentional sex discrimination in wages is precluded unless it satisfies the equal work standard of the Equal Pay Act.[2] *See id.* at 165–66, 101 S.Ct. at 2245–46.

---

1. The same standards governing Title VII liability also govern liability under § 1981. *McCalpine v. Foertsch*, 870 F.2d 409, 414 (7th Cir.1989). Accordingly, the court's findings regarding Title VII are equally applicable to Gibson's § 1981 claims.

2. The plaintiffs in *Gunther* were women prison guards who were paid substantially lower wages than male guards. The district court found that the jobs of the women prison guards were not substantially equal to those of male guards and dismissed their Equal Pay Act claim. The district court also held that a sex-based wage dis-

Nor has the Seventh Circuit delineated the elements necessary for a *prima facie* case of wage discrimination under Title VII. *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 338 (7th Cir.1993). However, in *Weiss*, the court held that a female plaintiff "cannot establish a prima facie case of salary discrimination without evidence that similarly-situated males were paid more." *Id.* The court provided no guidance on the meaning of the term "similarly situated" as used in this context.

Gibson has submitted sufficient evidence to raise a genuine factual issue as to whether similarly situated white and male employees were paid more. Gibson submitted ALA job-classification documents showing that most of the positions she uses for salary comparison are encompassed by the same job title ("Supervisor II"). Gibson's Facts, Exh. 0-1, Job Title/Job Group Dictionary. A Supervisor II is defined as:

> A person who manages a departmental operation, typically directing work of S1 managers and professional staff; handles or markets medium or major membership divisions or indirect services to members. Incumbents typically have educational credentials, relevant training and experience and administrative backgrounds.

*Id.* The Supervisor II position includes, among others: controller, data processing manager, director membership services, director of human resources, public information officer, accreditation officer, and director of marketing—all positions with which Gibson compares her own position. *Id.* Additionally, Gibson submitted a memorandum written by Crismond that describes ALA's job classification system. *Id.*, Exh. 0-2. The memorandum describes the classification process as involving the scoring of each position on nineteen weighted factors grouped into six categories: (1) job complexity, (2) personal interaction, (3) scope of personnel management responsibility, (4) working con-

ditions, (5) job impact, and (6) job related training and education. The total point score for a given position places it at a specific grade level in ALA's salary structure. *Id.* The classification system appears to be aimed at developing internal comparable worth ratings. In fact, Crismond's memorandum indicates that "internal equity" was one of the objectives of the classification system. *Id.* Thus, a reasonable inference may be drawn that ALA's own multifactor analysis of job positions categorized Gibson's position in the same class, for pay equity purposes, as those positions advanced by Gibson for comparison. This is sufficient to raise a genuine issue as to whether Gibson was similarly situated to whites and males who were paid more.

This does not end the inquiry however. Seventh Circuit opinions addressing Title VII wage discrimination claims have interpreted *Gunther* narrowly for the proposition that a Title VII wage discrimination claim requires direct evidence of intentional discrimination. *See, e.g., E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 342–43 (7th Cir.1988); *American Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 721 (7th Cir.1986); *see also Gallagher v. Kleinwort Benson Gov. Securities*, 698 F.Supp. 1401, 1405 (N.D.Ill.1988) (noting that the Seventh Circuit requires direct evidence of discrimination; circumstantial evidence of discrimination is insufficient to withstand summary judgment).

Gibson submits evidence that a white woman was granted a salary increase to achieve equity with her peers, apparently based on the job position analysis described above, whereas Gibson received no salary adjustment. *See* Gibson Facts, Exh. 0–3. This evidence, in conjunction with evidence of ALA's purported desire to achieve pay equity within ALA positions, *id.*, Exh. 0–2, is direct evidence of race discrimination sufficient to withstand ALA's motion for summary judgment on her race-based wage discrimination

crimination claim could not lie under Title VII unless it satisfied the equal work standard of the Equal Pay Act. The Ninth Circuit reversed and remanded with instructions to take evidence on the claim that the pay differential was attributable in part to sex discrimination. The women guards contended that the county evaluated the

worth of their jobs and concluded that they should be paid approximately 95% as much as male guards; however, the county only paid them about 75% as much. The women guards contended that this difference constituted evidence of intentional sex discrimination.

claim under Title VII and section 1981.[3] *Cf. Gunther*, 452 U.S. at 180–81, 101 S.Ct. at 2253 (county's adherence to its comparable worth study for male salaries but not female salaries constitutes direct evidence). However, because Gibson presents no direct evidence of sex-based wage discrimination, summary judgment is granted on her sex-based wage discrimination claim.[4]

### Terms And Conditions

■■■■ As set forth above, Gibson alleges a number of incidents that she claims constitute race and sex discrimination in violation of Title VII and 42 U.S.C. § 1981. The allegations constitute a claim of racial harassment due to a hostile work environment.[5] As the Supreme Court has noted:

> "[t]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination."

*Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

The Court noted that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* 477 U.S. at 65, 106 S.Ct. at 2405. The Seventh Circuit described the standard of liability for racial harassment claims in *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372 (1986), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987):

> [O]ccasional or sporadic instances of the use of racial or ethnic slurs do not in and of themselves constitute a violation of Title VII. The question in each case is whether the quantity and frequency of the abusive language are sufficient to state a violation of Title VII or section 1981. This determination must be made on a case-by-case basis after consideration of the totality of the circumstances.

*Id.* at 1380–81. In *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir.1989), the court further articulated the proper legal inquiry:

> [A] district court must employ a dual standard when evaluating a Title VII sexual [or racial] harassment claim, considering the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her

---

**3.** Gibson has also submitted summary data regarding performance ratings, salaries, annual monetary awards, and minority representation within ALA positions. None of the summary data is accompanied by tests of statistical significance that are necessary to determine whether the apparent minority/nonminority differences in the data are statistically significant. In the absence of this information, it is impossible to determine whether Gibson's data is probative evidence of discrimination. Additionally, to the extent that the data purport to demonstrate that minorities are concentrated at the lower end of ALA's job structure, this data cannot be interpreted in the absence of data on minority representation in the relevant job pools. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) (proper comparison is between racial composition of employer's workforce and racial composition of qualified applicant pool in the relevant labor market).

**4.** Although the court is obliged to follow the Seventh Circuit's guidance on the standards governing Title VII wage discrimination claims, it has reservations about imposing a requirement that Title VII wage discrimination plaintiffs must adduce direct evidence of discrimination. There

is no basis in law or logic for demanding direct evidence rather than circumstantial evidence in a Title VII wage discrimination claim. Circumstantial evidence of intentional discrimination suffices for all other types of Title VII discrimination claims. The direct evidence requirement has its roots in a miserly reading of *Gunther*, which held that direct evidence was *sufficient* not *necessary* for a Title VII wage discrimination action to lie. Further, whatever justification there may be in imposing a heightened standard for sex-based Title VII wage discrimination claims—for example, to prevent end-runs around the Equal Pay Act's equal work requirement—that justification is absent where the wage discrimination claim is race-based.

**5.** ALA contends that allegations of racial harassment exceed the scope of Gibson's charge of discrimination filed with the EEOC. If this were true, Gibson's racial harassment claims would be subject to dismissal. However, ALA has failed to submit Gibson's EEOC charge of discrimination in support of its motion for summary judgment and it is not presently part of the record. Gibson's complaint only included her right to sue letter. Consequently, the court cannot ascertain whether Gibson's claims exceed her EEOC charge.

well-being, as well as the actual effect upon the particular plaintiff bringing the claim. *Id.* at 419; *see also Daniels v. Essex Group, Inc.,* 937 F.2d 1264 (7th Cir.1991) (applying *Brooms'* combined objective-subjective analysis). In evaluating the objective component of a racial harassment claim, the court may consider a range of factors to determine the reasonableness of the claim. *See Daniels,* 937 F.2d at 1273–74. The inquiry is necessarily individualized and focuses on the totality of circumstances. *Id.* at 1270.

ALA meticulously dissects Gibson's allegations, analyzing them individually, and concludes that she fails to present evidence regarding any of the allegations from which a jury could reasonably infer discrimination. ALA Br. at 11–16. Not only does ALA's particularistic analysis disregard the totality of Gibson's circumstances but ALA's analysis also ignores evidence Gibson submitted.

Gibson submitted several affidavits from co-employees—minority and nonminority—attesting to their experiences with racism at ALA. David Booz, a white male, attested that while he was controller of ALA, he hired three supervisory employees—one of whom was African American. Booz stated that he was instructed by his supervisor to check five references for the African American applicant rather than the customary three. Further, Booz was instructed to call the college that the applicant had graduated from to verify that he had graduated; Booz had never been instructed to do this for a white applicant. Booz also stated that he was told that the minority applicant could only be hired in the first quartile of his pay grade range. The nonAfrican American applicants hired by Booz were hired at the second quartile. Finally, Booz stated that when his offices were moved in 1989 or 1990, Martin informed him of the move six months in advance so that he could plan the move and work out the logistics. Gibson Facts, Exh. B, Booz Aff. ¶¶ 3–6. Mattye Nelson also stated that in the past, when personnel were moved, they were told in advance. Gibson Facts, Exh. G, Nelson Dep. at 49. In partic-

ular, Nelson stated that Hodges, a white male, had advance notice of the move that Gibson claims she was not informed about. *Id.* Robert Smoot, an African American, attested that he and two other African Americans were once told by Swedowski that if any of them complained at an upcoming meeting with Martin that their supervisor Jennifer Tams had taken racially motivated actions, they would be fired on the spot. *Id.,* Exh. D, Smoot Aff. Delstene Atkinson, an African American woman, testified that Crismond tended to be less respectful toward minorities than nonminorities. *Id.,* Exh. F, Atkinson Dep. at 21–22. Atkinson also stated that she was not afforded the secretarial support she needed for her job. *Id.* at 29–30.

Although the foregoing evidence does not all relate directly to Gibson's allegations—and, admittedly amount to a very slender reed upon which to hang Gibson's racial harassment claim, the proffered evidence is sufficient to support an inference that racism permeated the ALA supervisory ranks and may have been a motivating factor in the incidents Gibson complains of. Viewed in its entirety, Gibson's evidence raises a genuine issue as to the objective element of a racial harassment claim. ALA does not challenge Gibson's claims with respect to the subjective element. In any event, the court finds that Gibson raises a genuine issue as to her subjective reaction to the alleged harassment.

The court recognizes that Gibson's evidence is weak, particularly insofar as it fails to connect generalized allegations of racism at ALA to the instances of conduct about which she complains.[6] However, the court cannot conclude that a reasonable jury would be unable to find sufficient indirect evidence of intentional discrimination to support a racial harassment claim.

The court also recognizes that much of Gibson's evidence appears to involve relatively minor incidents. However, the totality-of-the-circumstances standard does not permit an incident by incident analysis of the magnitude of insult suffered on any single occasion. Viewed in totality, Gibson's evidence of re-

---

**6.** Smoot's statement that he and other African Americans were threatened with termination if they reported racial discrimination suggests one reason why Gibson may have difficulty producing direct evidence of discrimination.

peated interpersonal insults, in conjunction with her indirect evidence that racial animus motivated the affronts, sufficiently raise a genuine factual issue of racial harassment to withstand ALA's motion for summary judgment.

Gibson has offered no comparable evidence bearing on her sexual harassment claim. Accordingly, ALA's motion is granted with respect to Gibson's Title VII sexual harassment claim.

### Intentional Infliction Of Emotional Distress

Gibson's supplemental claim of intentional infliction of emotional distress is governed by Illinois law. To prevail in a cause of action for intentional infliction of emotional distress, Gibson must demonstrate that ALA's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d). It is not enough "that the defendant acted with an intent which is tortious or even criminal, ... or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* Moreover, ALA must intend that its conduct inflict severe emotional distress or know that there is a high probability that the conduct would cause severe distress. *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir.1993). The facts of each particular case are to be judged by an objective standard to determine whether the alleged conduct was extreme and outrageous. *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 623 (7th Cir.1989).

Gibson's evidence could not support a reasonable jury verdict in her favor under the foregoing standards. Even if the jury were to determine that Gibson was the subject of intentional racial discrimination, the particular conduct complained of could not reasonably be found to be so outrageous or so extreme as to be beyond all possible bounds of human decency. Accordingly,

ALA's motion is granted as to Gibson's claim for intentional infliction of emotional distress.

### Constructive Discharge

To establish constructive discharge, Gibson must show that ALA made her working conditions so intolerable that she was forced into an involuntary resignation. *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 314 (7th Cir.1986). Gibson must establish that she was "confronted with an aggravated situation beyond the fact of ordinary discrimination on the job." *Taylor v. Western and Southern Life Ins. Co.,* 966 F.2d 1188, 1194 (7th Cir.1992) (citation omitted).

Gibson's evidence falls far short of creating a genuine issue as to her claim that she was constructively discharged. Viewing Gibson's evidence in the light most favorable to her, the court finds that the evidence could not support a reasonable finding in her favor on her constructive discharge claim. Many of Gibson's allegations involve incidents in which her supervisors were inconsiderate, or disrespectful (*e.g.,* Martin's failure to meet with her during her first week of work, Crismond's failure to greet her at the affirmative action meeting, ALA's failure to provide greater notice regarding her travel to San Antonio or the move of the human resource offices, ALA's greater receptivity to Reese's affirmative action recommendations, ALA's failure to adopt Gibson's Fair Labor Standards advice). Most of Gibson's remaining allegations suggest at most "ordinary" discrimination (*e.g.,* Gibson's inability to obtain needed secretarial support, Martin's requirement that Gibson clear her ideas through Brewer, Martin's refusal to let Gibson's sister work at ALA, the requirement that Gibson consult with program officers before implementing plans). It is well established that allegations of this sort cannot support a claim of constructive discharge because, demeaning as theses incidents may be, they involve conditions of employment that would not lead a reasonable person to quit. *See, e.g., Saxton v. American Telephone & Telegraph Co.,* 785 F.Supp. 760 (N.D.Ill.1992); *Phaup v. Pepsi–Cola General Bottlers, Inc.,* 761 F.Supp. 555 (N.D.Ill.1991); *Miller v. State of Illinois,* 681 F.Supp. 538 (N.D.Ill.1988).

Gibson's only evidence suggesting the existence of aggravated conditions are the threat allegedly made by her co-employee Harmon and the insulting messages left on Gibson's voice mail. Neither of these incidents raise a genuine issue as to constructive discharge. ALA's evidence indicates that after Gibson complained of Harmon's alleged threat, Parent—Harmon's supervisor—spoke with Harmon, who denied making any threat to Gibson. ALA Facts, Exh. A, Martin Aff., ¶ 12; *Id.*, Exh. D, Harmon Aff., ¶ 4. Because Gibson's allegation of Harmon's threat was uncorroborated, Parent took no action. *Id.*, Exh. C, ¶ 10. Gibson offers no evidence contesting these facts. With respect to the insulting voice mail messages, Gibson admits that she does not know who left the messages, whether the messages were intended for her, or whether the messages were left by an ALA employee. *Id.*, Exh. B, Gibson Dep. at 485. These facts fail to raise a genuine issue as to whether Gibson was subjected to aggravated working conditions. Because Gibson's evidence is insufficient to permit a reasonable jury to return a verdict in her favor on her constructive discharge claim, ALA's motion for summary judgement on this claim is granted.

## CONCLUSION

Defendant American Library Association's motion for summary judgment is granted in part and denied in part. Summary judgment is granted as to Gibson's claim under the Equal Pay Act (Count V), Gibson's claim of sexual discrimination under Title VII (Count I), Gibson's supplemental claim of intentional infliction of emotional distress (Count III), and her claims of constructive discharge in Counts II and IV. The motion for summary judgment is denied in all other respects. The parties are directed to present their joint final pretrial order on September 23, 1993 at 9:00 a.m. This case is placed on the court's October trial calendar.

## MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

Plaintiff Marla Gibson sues defendant American Library Association ("ALA") for race and sex-based employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, Pub.L. 102–166 § 101(2) (Nov. 21, 1991). Gibson also sues under the Equal Pay Act, 29 U.S.C. § 206(d). In addition to these federal claims, Gibson sues ALA for intentional infliction of emotional distress, invoking the court's supplemental jurisdiction under 28 U.S.C. § 1367. The court recently granted ALA's motion for summary judgment in part: Summary judgment was granted as to Gibson's claim under the Equal Pay Act (Count V), Gibson's claim of sex discrimination under Title VII (Count II), Gibson's supplemental claim of intentional infliction of emotional distress (count III), and her claims of constructive discharge in Counts II and IV. ALA's summary judgment motion was denied with respect to Gibson's claims of race-based wage discrimination and racial harassment under Title VII and 42 U.S.C. § 1981 (Counts II and IV). *See Gibson v. American Library Association*, No. 92 C 5284, Memorandum Opinion and Order (N.D.Ill. August 25, 1993) ("the opinion"). ALA seeks reconsideration of those portions of the opinion denying summary judgment on Gibson's race-based wage discrimination and racial harassment claims.

Motions for reconsideration serve a limited function. *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984). *Accord Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985). A court will ordinarily grant a motion for reconsideration to correct manifest errors of law or fact or to consider newly discovered evidence that could not have been adduced during the pendency of the previous motion. *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.1987); *Kohl v. Murphy*, 767 F.Supp. 895, 904 (N.D.Ill.1991). Motions for reconsideration may not raise legal theories or arguments that could have been raised in the original motion. *Id.* at 904. *Accord Woods v. Michigan City*, 940 F.2d 275, 280 (7th Cir.1991).

## 1. Race–Based Wage Discrimination

██ Seventh Circuit opinions interpreting and applying *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (plaintiff alleging wage discrimination under Title VII need not satisfy the Equal Pay Act's equal work requirement where the plaintiff presents direct evidence of intentional discrimination), have held that in order to prevail on a claim of wage discrimination under Title VII, a plaintiff must present *direct* evidence of intentional discrimination. *See, e.g., E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 342–43 (7th Cir.1988); *American Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 721 (7th Cir. 1986); *see also Gallagher v. Kleinwort Benson Gov. Securities*, 698 F.Supp. 1401, 1405 (N.D.Ill.1988) (noting the Seventh Circuit's requirement of direct evidence).

The court's opinion denying summary judgment on Gibson's wage discrimination claims found that Gibson had presented sufficient direct evidence of discrimination to withstand ALA's motion for summary judgment. In particular, the court found Gibson's evidence that a white woman (Peggy Barber) was granted a salary increase to achieve pay equity with her peers—in conjunction with Gibson's evidence concerning ALA's job-classification study and ALA's efforts at achieving pay equity—to be sufficient direct evidence. However, as ALA now correctly points out, the court's finding was predicated on the mistaken impression that Barber's "pay-equity" salary increase was based on ALA's job-classification study. *See* Opinion at 1337. The court reasoned that if ALA adopted the findings of its own job-classification study and granted a pay-equity salary increase for a white woman but not for Gibson, then sufficient direct evidence of discrimination was presented to withstand summary judgment. *Cf. Gunther*, 452 U.S. at 180–81, 101 S.Ct. at 2253 (county's adherence to its comparable worth study for male salaries but not female salaries constitutes direct evidence). ALA's motion for reconsideration points out that Barber's salary increase, while indisputably aimed at achieving pay equity with her peers, predated ALA's job classification study. ALA Br. at 4 n. 2.

Thus, it cannot be concluded that ALA adopted and implemented the findings of its study for a white woman but not for Gibson; hence, Gibson's direct evidence of discrimination dissolves. At best, Gibson is left with circumstantial evidence of wage discrimination—amounting to a comparison of Gibson's salary with other ALA employees classified in the same job title classification (Supervisor II). This is insufficient to establish a claim of wage discrimination under Title VII or 42 U.S.C. § 1981. *Cf. American Nurses' Ass'n v. State of Illinois*, 783 F.2d 716 (7th Cir. 1986). Accordingly, ALA's motion for summary judgment on Gibson's race-based wage discrimination claims in Counts II and IV must be granted.

## 2. Racial Harassment

ALA's request that the court reconsider its denial of summary judgment on Gibson's racial harassment claims is based on two grounds: First, ALA maintains that Gibson's evidence of racial motivation all relates to employees uninvolved in the incidents about which she complains and hence has no relevance to those incidents. Second, ALA contends that Gibson's allegations do not rise to the level necessary to support a racial harassment claim.

In denying ALA's summary judgment motion, the court found that the affidavits of Gibson's coemployees attesting to their experiences with racism at ALA provided sufficient evidence to support an inference that racism permeated the ALA supervisory ranks and may have been a motivating factor in the incidents about which Gibson complains. Opinion at 1338–39. ALA contends that the coemployees' affidavits all relate "to employees uninvolved in the incidents complained of by Plaintiff or to matters having no bearing in those incidents." ALA Br. at 9. ALA argues that generally actions and comments by employees not involved in the actions complained of by a plaintiff cannot provide a basis for charging other employees with discrimination. *See, e.g., Fortino v. Quasar Co.*, 950 F.2d 389, 395 (7th Cir.1991); *but cf. Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir.1989) (finding remarks of an uninvolved employee relevant

where jury could find that the decision-maker accepted that employee's input).

ALA is incorrect in asserting that the affidavits all relate to persons uninvolved in the incidents complained of by Gibson or having no bearing on them. David Booz attested that when his offices were moved in 1989 or 1990, Ernest Martin informed him of the move in advance so that he could plan the move and work out its logistics. Booz Aff. ¶ 16. Gibson alleges, and Martin does not deny, that when her offices were moved she was afforded no advance notice. Similarly, Mattye Nelson attested that in the past, when personnel were moved, they were given advance notice. Nelson Dep. at 49. Delstene Atkinson, an African American woman, attested that Linda Crismond, then ALA's executive director, was less respectful toward minorities than nonminorities. Atkinson Dep. at 21–22. Atkinson noted that "on several occasions" Crismond "totally disregard[ed] me, totally disrespected me as a person." *Id.* at 21. Atkinson stated that Crismond was also insensitive to Gibson. *Id.* One of Gibson's many allegations of harassment involves Crismond's rudeness to her. Thus, the affidavits of Booz, Nelson and Atkinson speak directly about employees (Martin and Crismond) involved in the incidents about which Gibson complains and the affidavits speak directly to those issues. Furthermore, the affidavits are sufficient to raise a genuine issue as to the existence of racial discrimination. ALA's evidence that Martin chose not to inform Gibson about her office relocation because of her angry and emotional reactions to his ideas in the past, *see* Second Martin Aff. ¶ 3, and ALA's evidence that Crismond was gruff and insensitive to nonminorities as well as minorities, *see id.* ¶ 7; Barber Aff. ¶ 3, at best indicates the existence of a factual issue with respect to Martin's and Crismond's intentions and motivation in dealing with Gibson.

Robert Smoot attested to a particularly pernicious and troublesome event. Smoot stated that he and two other African American employees were told by the comptroller, Russ Swedowski, that if—during the course of an upcoming meeting with Martin—any of them accused their supervisor, Jennifer Tam, of taking racially motivated actions, they would be fired on the spot. Smoot Aff. Smoot's testimony is evidence that a member of ALA's management forced a conspiracy of silence regarding racial discrimination upon lower level employees by threat of termination.[1] ALA contends, however, that this is irrelevant because Swedowski is not directly implicated in any of Gibson's claims.

In addition to his testimony discussed above, Booz also attested that he was instructed by his supervisor to subject the application of a minority job applicant to more rigorous scrutiny—including contacting five rather than the customary three references and contacting the applicant's college to verify that he had graduated—than that given to white applicants. Booz Aff. ¶¶ 3, 4. ALA also contends that this testimony is irrelevant because Booz's supervisor, Susan Odmark, who allegedly instructed him to conduct this rigorous evaluation, is not implicated by Gibson's claims.

Because the testimony of Booz (discussed above), Nelson, and Atkinson sufficiently raises a genuine issue as to racial discrimination, the court need not reach the issue of whether Smoot's and Booz's testimony concerning employees not directly involved in the incidents alleged by Gibson is relevant to her claims of racial harassment.

Finally, ALA seizes on the court's statement that "much of Gibson's evidence appears to involve relatively minor incidents," Opinion at 17–18,[2] and contends that Gibson's

---

1. This practice strikes at the heart of Title VII's goal of eradicating discrimination from the work place. If managers could successfully silence their employees from reporting acts of discrimination, plaintiffs would have an impossible burden of producing evidence of discrimination.

2. The court's full statement was: "The court ... recognizes that much of Gibson's evidence appears to involve relatively minor incidents.

However, the totality-of-the-circumstances standard does not permit an incident by incident analysis of the magnitude of insult suffered on any single occasion." Opinion at 17–18. The import of this statement is that the severity of incidents alleged in a racial harassment claim must not be measured in isolation but rather must be measured within the context of the alleged harassment.

allegations do not rise to the level of severity necessary to support a racial harassment claim.[3] Implicitly suggesting that the court merely summed Gibson's "minor incidents" in finding that she raised a genuine issue as to racial harassment, ALA notes that a Title VII plaintiff does not prove racial harassment simply by alleging some magic number of incidents. ALA Br. at 13 citing *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir.1991).

The court's denial of summary judgment on Gibson's racial harassment claim was not based on the sheer number of incidents that Gibson alleged. Rather the court's finding that Gibson's evidence sufficiently raised a genuine factual issue of racial harassment rested on the implicit finding that the incidents of harassment shown by Gibson were sufficiently severe or pervasive to "alter the conditions of [her] employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Gibson's evidence supports an inference that from the day she started work at ALA, she was met with interpersonal insults and hostility, lack of professional respect, physical threats, insulting phone messages, was made to clear her ideas through a subordinate, and was subjected to working conditions that made her job more difficult (*e.g.*, lack of support, office relocation without notice). The evidence supports the inference that these incidents were not merely isolated events but rather were pervasive features of Gibson's work environment.

 ALA's citations to *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333 (7th Cir. 1993), and *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986), wherein the court found that the incidents of sexual harassment alleged by the plaintiffs were not sufficiently pervasive to support a claim of sexual harassment, do not compel the conclusion that the court committed a manifest error of law in

finding that Gibson raises a genuine issue of harassment. Claims of racial harassment in the work place must be evaluated "on a case-by-case basis after considering the totality of the circumstances." *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1270 (7th Cir. 1991). The court must conduct a particularized inquiry into the employment environment to determine whether the conditions rise to the level of racial harassment. *Id.* Having considered all of Gibson's evidence, the court previously concluded that Gibson raises a genuine issue as to the existence of racial harassment at ALA. Because the court finds no manifest error of law in this conclusion, ALA's motion for reconsideration of the Court's denial of summary judgment on Gibson's claims of racial harassment in Counts II and IV is denied.

## CONCLUSION

Defendant's motion for reconsideration is granted in part. Summary judgment is granted in favor of defendant American Library Association and against plaintiff Marla Gibson on Gibson's claim of wage discrimination under Title VII and 42 U.S.C. § 1981 in counts II and IV. Defendant's motion for reconsideration is denied in all other respects. On the court's own motion, the pretrial order submission date of September 23, 1993 is extended to September 30, 1993.

---

**3.** ALA's motion for summary judgment summarily concluded that Gibson was not asserting a claim of racial harassment. ALA Summary Judgment Br. at 16. Nevertheless, ALA noted that "the events asserted by Plaintiff do not approach the level required to sustain a claim of racial harassment, even if cast in a light most favorable to Plaintiff." *Id.* n. 6. ALA's motion for reconsideration argues this point in greater detail. Because ALA raised this argument in its original motion, it is not precluded from raising the issue in its motion for reconsideration.